ORIGINAL

JOHN S. CARROLL, #0649
810 Richards Street Suite 810
Honolulu, Hawai`i 96813
(808) 526-9111

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

NOV 29 2012

at____o'clock and_____min.____M.
SUE BEITIA, CLERK

Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAI`I

PATRICK NOVAK;  DANIEL
ROCHA; LARRY KENNER, dba
KENNER, INC., a Hawai`i
corporation; KEN SCHOOLLAND;
BJORN ARNTZEN; PHILIP R.
WILKERSON; and WILLIAM
AKINA, Ph.D, Individually and as
representatives of a class of
similarly situated persons,

Vs.

UNITED STATES OF AMERICA,
and  DOES 1-100 inclusive,

Defendants.

) Civil No. CV12 00638 LEK    RLP
)
)
)
) COMPLAINT; SUMMONS;
) PROOF OF SERVICE
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## **Complaint**

Come now Plaintiffs PATRICK NOVAK; DANIEL ROCHA; LARRY

KENNER, dba KENNER, INC.; KEN SCHOOLLAND; BJORN ARNTZEN;

PHILIP R. WILKERSON; WILLIAM AKINA, Ph.D, Individually and as representatives of a class of similarly situated persons, (hereinafter "the Class"), by and through their undersigned counsel, and for causes of action against Defendant UNITED STATES OF AMERICA and DOES 1 through 100 inclusive, allege and aver as follows:

## I. Introduction

1. The Class brings this action on behalf of themselves individually and behalf of a Plaintiff Class consisting of all persons and entities in the United States, and its territories and possessions, who have any personal, professional, or commercial relationship with the State of Hawai`i such that they are materially affected by the 46 U.S.C §55102, 55105, 12132, 55115, 12101, 55116, 55110, 55119, 55108, 55117, 55107, 55106 (formerly codified as 46 U.S.C §883) (hereinafter "the Jones Act") from at least September 1, 1959 ("Class Period").

2. Defendant UNITED STATES OF AMERICA (hereinafter "UNITED STATES") is a sovereign nation, which has consented to be sued.

3.   Defendant's enactment and enforcement of The Jones Act's restrictions to
the State of Hawai`i results in unconscionable, inequitable harm and
inflated prices to the resident's and businesses of the State of Hawai`i to
such an extent that its application is an unlawful restraint of trade and
interstate commerce, thereby violating the Commerce Clause of the
United States Constitution, Article I, Section 8, Clause 3.

## II. Jurisdiction and Venue

4.   Plaintiffs bring this action under Article I, Section 8 of the United States
Constitution; 42 U.S.C §1983; and Fed.R.Civ.P.57, for a declaration that
the Jones Act is invalid as it applies to interstate commerce involving the
State of Hawai`i's commercial activities with the other United States of
America, Nations and Indian Tribes of the United States of America, and
to recover costs of suit and reasonable attorneys' fees.

5.   Jurisdiction is conferred upon this Court by 28 U.S.C. §1331, §1337, and
§1346.

6.   Venue is proper in this judicial district because, during the Class Period,
the Defendant resided, transacted business, was found, or had agents in

this district, and because a substantial part of the events giving rise to plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

7. Plaintiffs' claims are within this Court's Jurisdiction. In 1995, Congress passed the Interstate Commerce Commission Termination Act ("ICCTA"), with the intent to deregulate the domestic water trade. The ICCTA created a new agency, the Surface Transportation Board ("STB"), giving it limited jurisdiction over water carrier rates that fall outside of a define "zone of reasonableness" ("ZOR"). The ICCTA deregulated all rates that fall within the ZOR, which includes all of the fuel surcharges and rates that form the basis of price-fixing claims. In addition, the ICTT exempted certain areas of trade from jurisdiction of the STB, including bulk cargo, forest products, and trade that occurs pursuant to private contracts. Venue is also appropriate in this District because the Judicial Panel on Multidistrict Litigation has ordered these cases be centralized in this District.

8.  Hawaii is a chain of islands in the Pacific Ocean situated over 2,000 nautical miles from the west coast of the United States. Because of its location, Hawaii depends almost entirely on ocean shipping to import essential commodities like food, clothing, fuel, and building materials, as well as to export its local products like pineapple, sugar, molasses, and livestock. By one estimate, 98.6% of Hawaii's imports arrive by ocean shipping. Since 1997, according to the U.S. Department of Transportation ("DOT"), the Hawaii trade, in terms of tonnage, has been the largest of the noncontiguous domestic ocean shipping markets.

### III. The Parties

A.   **Plaintiffs**

9.  Plaintiff **Patrick Novak,** was the CEO of The French Gourmet, Inc., a Hawaii corporation. During the Class Period, The French Gourmet exported goods to the Continental United States, Singapore and Dubai from Hawaii, subjecting The French Gourmet Company to the Jones Act and reliance on the duopoly created by the Defendant. During the Class Period, The French Gourmet, Inc., purchased domestic ocean cargo shipping services on west coast Hawaii routes, paid fuel surcharges thereon, and suffered directly pecuniary injury and damages as a result of the Jones Act, and has suffered the damages contained herein.

10. Plaintiff **Daniel Rocha,** is a farmer and rancher. During the Class Period, The Daniel Rocha purchased domestic ocean cargo shipping services on west coast Hawaii routes, paid fuel surcharges thereon, and suffered directly pecuniary injury and damages as a result of the Jones Act, and has suffered damages contained herein.

11. Plaintiff **Kenner, Inc.,** is a distributor. During the Class Period, Kenner, Inc., purchased domestic ocean cargo shipping services on west coast Hawaii routes, paid fuel surcharges thereon, and suffered directly pecuniary injury and damages as a result of the Jones Act, and has suffered damages contained herein.

12. Plaintiff **Ken Schoolland,** is an Economics Professor and resident of Hawaii. During the Class Period, Ken Schoolland purchased domestic ocean cargo shipping services on west coast Hawaii routes, paid fuel surcharges thereon, and suffered directly pecuniary injury and damages as a result of the Jones Act, and has suffered damages contained herein.

13. Plaintiff **Bjorn Arntzen,** is a resident of Hawaii. During the Class Period, Bjorn Arntzen, purchased domestic ocean cargo shipping services on west coast Hawaii routes, paid fuel surcharges thereon, and suffered directly pecuniary injury and damages as a result of the Jones Act, and has suffered damages contained herein.

14. Plaintiff **Philip R. Wilkerson,** is a resident of Hawaii and raises some cattle commercially. During the Class Period, Phillip Wilkerson, purchased domestic ocean cargo shipping services on west coast Hawaii routes, paid fuel surcharges thereon, and suffered directly pecuniary injury and damages as a result of the Jones Act, and has suffered damages contained herein.

15. Plaintiff **William Akina, Ph.D,** is a resident of Hawaii and a professional philosopher and adjunct faculty member of Hawaii Pacific University.  During the Class Period, William Akina, purchased domestic ocean cargo shipping services on west coast Hawaii routes, paid fuel surcharges thereon, and suffered directly pecuniary injury and damages as a result of the Jones Act, and has suffered damages contained herein.

**B.**    **Defendant**

16. Defendant UNITED STATES is a sovereign nation, which has consented to be sued. During the Class Period, Defendant through its agents has impaired interstate commerce to the State of Hawai'i with the enacting of the Jones Act and its subsequent restrictions on interstate trade. The Class purchased products which were shipped in compliance with the Jones Act causing substantial financial loss.

17. The cause of the financial loss was the monopolistic environment created by Defendant. Defendant allowed Shippers to have a monopoly of ocean freight and automobiles between the continental United States, Hawai'i, Guam, and the Mid-Pacific. Hawaii's location compounds the devastating effects of the Jones Act, given Hawaii's low export market relative to the size of it's GDP. Jones Act imports subsidize the cost of ships leaving Hawaii ports "empty-handed" forcing Hawaii's purchasers to cover the losses of ships travelling with little or no cargo on the "back haul" to the continental United States.

18. The net result of this government created monopolistic environment is that the State of Hawai'i receives 67 percent of goods imported from the continental United States through Matson Navigation, a subsidiary of

Alexander and Baldwin, a Hawai`i corporation with its principal place of business in Honolulu, Hawai`i.  The remaining 33 percent is carried by Horizon Lines, Inc, a Delaware corporation with its principal place of business in Charlotte, North Carolina.  Plaintiffs acknowledge that Matson Navigation and Horizon Lines, Inc have operated legally under current federal law.

## C.   Agents and Doe Defendants

19. The acts alleged against UNITED STATES in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendant's businesses and affairs.

20. The officers, agents, employees, and representatives of UNITED STATES should have known that the Jones Act violated the basic tenants of the Commerce Clause of the United States Constitution.

21. Certain other persons, firms, corporations, and entities have participated as unnamed DOE DEFENDANTS in the violations alleged herein.  In order to engage in the offenses charged and violations alleged herein,

these DOE DEFENDANTS have performed acts and made statements in

furtherance of the constitutional violations alleged herein.  All averments

in this Complaint against UNITED STATES are also averred against

these unnamed DOE DEFENDANTS as though set forth at length.

### IV. Class Action Allegations

22. Plaintiff brings this action on behalf of itself and as a class action under

the provisions of Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of

Civil Procedure on behalf of the following Class:

All persons and entities in the United States, and its territories and

possessions, who purchased services between the continental United

States and Hawai`i in compliance with the Jones Act from at least

September 1, 1959 to the present.  This class excludes any judicial

officer who is assigned to hear any aspect of this action, governmental

entities, defendants, other agents of UNITED STATES, and the

present and former parents, predecessors, subsidiaries, and affiliates of

the foregoing.

23. Plaintiffs believe that there are thousands of Class members as above described, the exact number and their identities being known by Defendant.

24. The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

25. There are questions of law and fact common to the Class, which questions relate to the existence of the damages alleged, and the type of injury sustained as a result thereof, including, but not limited to:

    a.    The loss of agriculture, business, and tourism to the State of Hawai`i;

    b.    The adverse economic impact alleged in this Complaint;

    c.    Whether the enforcement of the Jones Act to the State of Hawai`i violated Section 1 of the Sherman Act;

    d.    Whether the conduct of Defendant and its agents, as alleged in this Complaint, caused injury to the business and property of plaintiffs and other members of the Class;

e.     The effect of Defendant's enforcement of the Jones Act on

prices during the Class Period;

f.     The appropriate measure of damages sustained by Plaintiffs and

other members of the Class.

26. Plaintiffs are members of the Class. Plaintiffs' claims are typical of the

claims of Class members and Plaintiffs will fairly and adequately protect

the interests of the members of the Class. Plaintiffs comply with the

Jones Act and Plaintiffs' interests are consistent with and not antagonistic

to those of the other members of the Class. In addition, Plaintiffs are

represented by Counsel who are competent and experienced in the

prosecution of constitutional law and class action litigation.

27. Noncontiguous domestic ocean shipping takes place between the

continental United States and Hawaii, Guam, Puerto Rico, and Alaska.

The domestic noncontiguous ocean shipping industry is subject to the

restrictions of the Merchant Marine Act of 1920, 46 U.S.C.  § 55102 (the

"Jones Act").

28. The Jones Act prohibits foreign competition in the domestic ocean shipping industry. The Jones Act requires that any goods "transported by water, or by land and water ... between points in the United States ... either directly or via a foreign port" be shipped by a vessel that "is wholly owned by citizens of the United States for purposes of engaging in the "coastwise trade" and has been issued a "certificate o f documentation" or is exempt from documentation. 46 U.S.C. § 55102(b).

29. The Jones Act applies different domestic shipping standards to the Hawaii trade than to the Guam trade. The Hawaii trade requires ships to be wholly Jones Act compliant, meaning that they must be built, owned, flagged, crewed, and operated by citizens of the United States. The Guam trade, however, operates under an exception to the Jones Act, allowing for ships that are foreign-built, though they still must be owned, flagged, and crewed by U.S. citizens. *See* 46 U.S.C. §§ 12111(b) & 12115(b).

30. Businesses that operate in the domestic ocean shipping market, such as Defendants, are known as "Jones Act carriers." The Jones Act carriers annually transport approximately one billion tons of cargo.

31. Although the Jones Act is a protectionist regulation, it does not permit collusion, market sharing, market allocation, market manipulation or price fixing. Such anticompetitive conduct by Jones Act carriers is illegal under the Sherman Act, subject to certain exemptions not applicable here. *See* 46 U.S.C. § 40307 (listing exemptions).

32. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

33. Defendant has acted, and has refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

34. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

35. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which records should exist in the files of the Defendant and

its agents.  Prosecution as a class action will eliminate the possibility of

repetitious litigation.  Treatment as a class action will permit a large

number of similarly situated persons to adjudicate their common claims

in a single forum simultaneously, efficiently, and without duplication of

effort and expense that numerous individual actions would engender.

Class treatment will also permit the adjudication of relatively small

claims by many Class members who otherwise could not afford to litigate

a constitutional violation claim such as is asserted in this Complaint.

This class action presents no difficulties of management that would

preclude its maintenance as a class action.

### V. Trade and Commerce

36. During the Class Period, Defendant impaired the flow of interstate

commerce to customers throughout to the State of Hawai`i.

37. The actions of Defendant that are the subject of this action were within

the flow of, and impaired, hindered, and substantially affected and

completely cut off Hawai`i from interstate commerce.  In the absence of

highways and railways, the Jones Act promises to nullify interstate

commerce to the State of Hawai`i.

38. Matson and Horizon (hereinafter "Shippers") service Hawaii primarily on "turnaround: routes, in which Hawaii is the primary or only destination. Thus the Hawaiian service operated by both Shippers has historically been self-contained. The bulk of the cargo on the Hawaii routes travels East to West, from the U.S mainland to Hawaii. As a result, capacity is generally close to full on the westbound routes and relatively empty on the Eastbound routes.

39. Shippers are the only two companies that provide ocean shipping services from the continental United States to Guam . Each company operates approximately five containerships on the Guam shipping route. Guam is serviced by these ships as part of the lucrative transpacific trade route between the U.S and Asia. Consequently the opportunity cost of making a trip to Guam is very low. Because the Guam trade is subsumed within the transpacific trade, it is difficult to allocate the costs of fuel, crew, and other expenses between items shipped to and from Guam and items shipped to and from Asia.

**Characteristics Of The Hawaii/Guam Market**

40. The Hawaii/Guam market has several characteristics that made it easy for the Shippers to conspire, including market concentration, significant barriers to entry, ease of information sharing, lack of viable alternatives to ocean shipping, and the commodity nature of ocean shipping services. The market is highly concentrated

41. Together Shippers control virtually the entire Hawaii/Guam market. For Hawaii, Matson controls approximately 65% of the market and Horizon controls approximately 35%. A very small percentage of the market is handled by specialized barges or auto carrier lines. Because of the greater distance between Guam and the continental United States, barge service is not a viable alternative to containership service. Consequently, Shippers control 100% of the shipping market to and from Guam. Defendant created this high degree of concentration in the Hawaii/Guam market possible with its Jones Act restrictions.

**There are no viable shipping alternatives to ocean shipping**

42. Ocean shipping is the only viable option for the Plaintiffs' and Class members' carriage because Hawaii and Guam are inaccessible by land. Competition from air transportation is limited due to the lack of large and

affordable air cargo space, and the Jones Act prevents foreign-source competition. As such demand for domestic noncontiguous ocean shipping is inelastic and near substitutes do not exist. The lack of viable economic substitutes facilitated the alleged conspiracy because it enabled the Defendants to set supra-competitive prices without fear that customers would switch to other alternatives.

**Ocean shipping services are a fungible commodity**

43. Domestic ocean shipping services are a fungible commodity because almost all shipping of general cargo (excluding certain bulk cargo) is containerized, and containers are interchangeable regardless of carrier.

**(2)** Therefore, purchasers of ocean shipping services choose between carriers based on price, capacity and selling dates. Accordingly, Shippers only have to compete (or agree not to compete) on price, capacity, and sailing dates.

**The economic structure of the Hawaii/Guam is substantially similar to the economic structure of the Puerto/Rico market.**

44. The economic structure of the Hawaii/Guam market is substantially similar to the economic structure in the Puerto Rico market. Both markets are highly concentrated with a limited number of players, both are

protected from foreign competition by the Jones Act's restrictions, both concern the same commodity service where few, if any, substitutes exist, and both have high barriers to entry. In addition, cargo fees are calculated by revenue ton in both markets.

45. In addition to the structural similarities of the markets, there is a high degree of corporate and individual overlap in the two markets. Horizon has participated in the Hawaii/Guam market since 1986, and it has participated in the Puerto Rico market for even longer.

46. Matson and Horizon and (through its ownership and control over Sea-Star and Totem Ocean Trailer Express ("TOTE")) are the only three companies that own and operate Jones Act containerships. The ships that operate in the noncontiguous domestic ocean shipping markets are often leased and interchanged among the different markets. Due to the limited number of Jones Act qualified vessels, even minimal changes in the deployment of containerships have a profound influence on all of the Jones Act routes. The carriers in the Jones Act markets have used this interchangeability between markets as a way to artificially manipulate and curtail supply. For example, a carrier can take capacity out of one

market and shift or "dump" it into another. The three Jones Act carriers communicate with one another to ensure that surplus ships in one trade route will not harm the profits of the carriers in the other Jones Act markets.

47. **Defendant has emboldened Shippers to take actions that any fair-minded individual would deem as collusion and price fixing**. From 1999 to April of 2008 Shippers increased their rates in lockste. In May of 2006, both Shippers simultaneously announced they would start adjusting fuel surcharges whenever they deemed necessary as opposed to the traditional quarterly basis. By April of 2008, Shippers were both charging 33.7% of the base-shipping fee as a fuel surcharge, although no corresponding rise in fuel prices justified such an increase.

48. Shippers' lockstep fuel surcharges are detailed below:

| Effective Date | Matson Fuel Surcharge % | Horizon Fuel Surcharge % |
|---|---|---|
| January-September 1999 | 0% | 0% |
| October 1999 | 1.75% | 1.75% |
| February 2000 | 2.25% | 2.25% |

| March-April 2000 | 3.25% | 3.25% |
|---|---|---|
| October 2000 | 4.75% | 4.75% |
| November 2001 | 3.25% | 3.25% |
| May 2002 | 4.75% | 4.75% |
| October 2002 | 6.00% | 6.00% |
| March 2003 | 7.50% | 7.50% |
| May 2003 | 6.50% | 6.50% |
| September 2003 | 7.50% | 7.50% |
| March 2004 | 8.00% | 8.00% |
| June 2004 | 8.00% | 8.00% |
| October 2004 | 9.20% | 9.20% |
| April 2005 | 10.50% | 10.50% |
| July 2005 | 11.50% | 11.50% |
| October 2005 | 13.00% | 13.00% |
| January 2006 | 15.00% | 15.00% |
| April 2006 | 18.50% | 18.50% |
| June 2006 | 21.25% | 21.25% |
| October 2006 | 19.75% | 19.75% |
| November 2006 | 18.75% | 18.75% |

| January 2007 | 17.50% | 17.50% |
|---|---|---|
| March 2007 | 19.50% | 19.50% |
| May 6, 2007 | 20.75% | 20.75% |
| May 27, 2007 | 22.50% | 22.50% |
| August 2007 | 24.00% | 24.00% |
| December 2007 | 29.00% | 29.00% |
| February 2008 | 31.50% | 31.50% |
| April 2008 | 33.75% | 33.75% |

49. Remarkably, in the 15 months between January 2007 and April 2008, Defendants increase their fuel surcharges from 17.5% to 33.75%, an increase of almost 100%. It was only after a Department of Justice antitrust investigation was announced in April 2008 that Shippers ceased their lockstep fuel surcharges and began to impose surcharges at different times and at different rates.

## VI. Factual Allegations

**A.      Importance of Ocean Transport**

50. Ocean shipping is a highly effective method of moving large quantities of non-perishable goods and raw materials.  The major commodities shipped through ocean shipping include crude petroleum, refined petroleum products, chemicals, manufactured goods, farm products, and coal.  Hawai`i is separated by 2,300 miles of ocean and is almost fully dependent on ocean shipping for at least 90 percent of every substance used and consumed.

51. The shipping industry has been protected by the laws of the United States of America because of the industry's importance to national security, defense, and international trade. Since the 1800's, ship owners have participated in liner conferences to coordinate service, exchange market information, and to agree upon rates.  In the international ocean shipping industry, these liner conferences, which have many cartel-like characteristics, have been exempt from U.S. antitrust laws.

52. The domestic ocean trade is comprised of the following three sectors: Noncontiguous trade between the continental United States and Puerto Rico, Alaska, Hawai`i, Guam, and other U.S. Pacific Islands; (b) coastwise trade along the Atlantic, Gulf, and Pacific coasts, as well as

trade between coasts and the St. Lawrence Seaway; and (c) <u>intercostal</u> <u>trade</u> between the Atlantic or Gulf and Pacific coasts by way of the Panama Canal.  This action relates solely to noncontiguous trade between the continental United States and Hawai`i.

53. Because of its location, the State of Hawai`i depends almost entirely on ocean shipping to import its essential commodities such as food, clothing, fuel, building materials, and automobiles, as well as to export its local products like pineapple, sugar, molasses, and livestock, to and from the neighbor islands, the continental United States, and various foreign countries.  By one estimate, 98.6 percent of all Hawai`i's imports arrive by ocean shipping.  In 2003, over 5 million metric tons of cargo was shipped in noncontiguous domestic trade with Hawai`i.

54. In January 2008, *Pacific Business News* reported that the cost of shipping goods to Hawai`i had risen as much as 40 percent since 2005.  This is the ongoing result of Defendant's enforcement of the Jones Act.

**B.     The Jones Act**

55. The Jones Act is a protectionist statute that prohibits any goods "transported by water, or by land and water... between points in the United States... either directly or via a foreign port," from being shipped unless the vessel "is wholly owned by citizens of the United States for purposes of engaging in the coastwise trade" and has been issued a "certificate of documentation" or is exempt from documentation. 46 U.S.C §55102.

56. The purpose of the Jones Act is to protect American shipping companies. It grants an exclusive privilege to certain U.S.-made, U.S.-manned, U.S.-flagged, and U.S. Coast Guard approved vessels to engage in ocean shipping of merchandise or goods to and from U.S. Territories, possessions, or non-contiguous states. These laws are restrictive, prohibiting all other vessels, such as foreign-flagged, foreign-built, foreign-crewed, or even foreign-refurbished vessels, from engaging in American domestic trade.

57. The Jones Act's restriction on the carriage of domestic cargoes to U.S.-made, U.S.-flagged, U.S.-crewed, and U.S.-owned ships control,

combined with the relatively small size of these trade routes, has resulted

in an essentially monopolistic Hawai`ian ocean shipping market.

58. The enforcement of the Jones Act contravenes the Commerce Clause of

the U.S. Constitution, as well as creating a climate that allows activity,

which is illegal under the Sherman Act.  An actual case and controversy

exists.   As shown in Paragraph # 47.

59. Although Matson Navigation and Horizon, Inc. claimed that these fuel

surcharges were necessary to recoup increased costs, the surcharges did

not reflect actual fuel cost increase.  Fuel costs among ocean liners vary

significantly due to a number of unique factors, such as differences in

vessels and fuel efficiency, differences in routes, the use of hedging, and

individual fuel conservation efforts.  It is highly unlikely, if not

impossible, that Matson Navigation and Horizon, Inc. incurred identical

fuel expense increases.  Furthermore, the revenue generated by the fuel

surcharges depends on the underlying revenues generated per container

and container utilization, both of which vary between the two carriers.

Thus, there is a no way that these fuel surcharges only raised enough

additional revenue to cover the increased costs that each carrier experienced.

## VIII. Causes of Action

60. Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

61. Defendant's unlawful conduct  has resulted in high prices, a de facto duopoly operated by Matson Navigation and Horizon Inc.

62. Plaintiffs and members of the Class have suffered extreme economic hardship, bankruptcies and had to pay far more to conduct business in the State of Hawai`i than they would have in the absence of the Jones Act restrictions. Every business, all agricultural production and consumers are adversely affected economically by the restrictions of the Jones Act provisions complained of hereinabove.

63. Plaintiffs seek to recover for these overcharge damages.

64. As a direct and proximate result of Defendant's actions, Plaintiffs and the members of the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined. Plaintiffs' injuries consist of paying higher prices to conduct business.

## IX. Prayer for Relief

WHEREFORE, Plaintiff prays as follows:

A.    That the Court determine this action be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.    That judgment be entered for Plaintiffs and members of the Class against Defendant for the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees as may be proved at trial.

C.    That Defendant, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on its behalf, be permanently enjoined and restrained from, in any manner enforcing the provisions of the Jones Act as it relates to or otherwise impairs the State of Hawai`i's equal access to U.S. interstate commerce with the States, Nations and Indian Tribes.

D.     That Plaintiff and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances and as shall be proved at trial of this case.

DATED: Honolulu, Hawai`i _____

_____
JOHN S. CARROLL, ESQ.
Attorney for Plaintiffs